UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH SCOFERO, GAIL LOGAN, and
BARBARA LANE, by her next friend
MONICA FOBBS, on behalf of
themselves and all other similarly
situated,

                Plaintiffs,

  -vs-

HOWARD ZUCKER, in his official
capacity as Commissioner of the New
York State Department of Health,

              Defendant.

**DECISION and ORDER
No. 6:16-cv-06125(MAT)**

---

## INTRODUCTION

Represented by counsel, Gail Logan ("Ms. Logan"), Joseph Scofero ("Mr. Scofero"), and Barbara Lane ("Ms. Lane"), by her next friend Monica Fobbs (collectively, "Plaintiffs"), bring this action on behalf of themselves and a putative class of New York State Medicaid beneficiaries[1] to compel Howard Zucker ("Zucker" or "Defendant"), in his official capacity as the Commissioner of the New York State Department of Health ("DOH"). Plaintiffs allege

---

[1] Plaintiffs define the class as "[a]ll current and future New York State Medicaid beneficiaries with disabilities who (1) have been found eligible for Managed Long Term Care (MLTC) by the conflict-free assessor (Maximus or its successors), (2) can be safely and appropriately cared for in a community setting, (3) have initiated contact with one or more MLTC plan(s) in order to enroll in a plan, and (4) have not been able to enroll in an MLTC plan before the expiration of the Maximus authorization, because all plans contacted have, through act or omission, either denied or discouraged enrollment." Plaintiffs' Motion for Class Certification is pending.

causes of action under the Medicaid Act, the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act, and their respective implementing regulations.

Plaintiffs have filed a Motion to Certify Class (Dkt #2), to which Defendant has not filed responsive papers. This motion remains pending. Plaintiffs recently moved for a preliminary injunction (Dkt #19) seeking an order that "requires Defendant Zucker immediately to arrange for" Mr. Scofero and Ms. Logan "to receive the 24-hour in-home care services they and their medical providers have requested" and to require the MLTC plans to provide written notice regarding certain determinations they have made. See Dkt #19-4 at 25.

For the reasons discussed below, Plaintiff's Motion for a Preliminary Injunction is denied without prejudice.

## FACTUAL BACKGROUND

### I.   Overview of the State Medicaid Program as Relevant to this Case

As Commissioner of DOH, Defendant is charged with administering New York State's Medicaid Program consistent with the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act. As a public entity within the meaning of Title II of the ADA, and the recipient of federal funding, DOH is subject to Section 504 of the Rehabilitation Act.

New York has designated DOH as the single state agency to be responsible for administering the Medicaid Program. DOH may not

-2-

delegate its "authority to supervise the plan or to develop or issue policies, rules, and regulations or program matter." 42 C.F.R. § 431.10(e)(1).

Under Section 1115 of the Social Security Act, the Secretary of the Department of Health and Human Services ("HHS") may allow states to implement "experimental, pilot or demonstration projects" that are "likely to assist in promoting the objectives" of the Medicaid Act. 42 U.S.C. § 1315(a). New York has operated its Medicaid Managed Care programs through a Section 1115 waiver, first approved in 1997, called the "Partnership Plan" (Waiver number 11-W-00114/2). See N.Y. Soc. Serv. L. § 364-j(2)(a). The Partnership Plan waives three provisions of the federal Medicaid Act (statewideness, comparability, and freedom of choice), but does not waive the mandatory home health requirement, see 42 U.S.C. § 1396a(a)(10(D); the reasonable promptness provision, see 42 U.S.C. § 1396a(a)(8); or the due process requirement, see 42 U.S.C. § 1396a(a)(3). The Partnership Plan allows New York to require most Medicaid beneficiaries to enroll in a managed care plan in order to receive covered services.

The term "home care" is an umbrella term covering several different types of services intended to meet Medicaid recipients' need for assistance in the home. At issue here are personal care services ("PCS") which is an optional Medicaid service, i.e., states participating in the Medicaid program may include payment

for PCS but are not required to do so. At times relevant to this lawsuit, New York's Medicaid program has included coverage of PCS, so long as the recipient has been assessed as meeting the PCS eligibility requirements, which include a current physician's order describing the recipient's medical condition and need for assistance with PCS tasks (e.g., bathing, toileting, and walking). The number of hours of PCS the recipient should receive is not a medical determination, but instead depends on nonmedical factors, such as the recipient's living arrangements and home environment, as well as the potential availability of any informal caregivers. Determining PCS eligibility and the appropriate number of hours and types of such services thus includes a comprehensive social and nursing assessment.

Since 2012, Medicaid beneficiaries aged 21 and older, who are also enrolled in Medicare (so-called dual enrollees), and who are in need of more than 120 days per year of home care services, have been required to enroll in a Managed Long Term Care ("MLTC") plan in order to receive in-home care services through Medicaid. Defendant has entered into contracts with the various MLTC plans (which are not parties to this action), pursuant to which he pays each plan a monthly capitated rate for every Medicaid beneficiary enrolled in the plan. The MLTC plans in turn provide care services to their enrollees. The MLTC plans must make Medicaid services included within their benefit package available to the same extent

-4-

they are available to recipients of fee-for-service Medicaid. <u>See</u> 42 U.S.C. § 1396b(m)(1)(A)(i). Under the MLTC Contract,[2] only the local Social Services districts (none of which are parties to this action), or an entity designated by DOH, may deny enrollment; an MLTC plan cannot deny enrollment. <u>See</u> MLTC Contract, Art. V(B)(3)(b).

Medicaid beneficiaries expected to enroll in MLTC plans in order to receive in-home care services must first be assessed for eligibility through the Conflict-Free Evaluation and Enrollment Center ("CFEEC"). Defendant has contracted with a company called Maximus, which is not a party to this action, to provide all activities related to the CFEEC, including the determination of whether an individual is eligible to receive in-home care through an MLTC plan. The CFEEC evaluation is limited to determining whether an individual is eligible for MLTC enrollment and whether in-home care services will allow him or her to remain safely in the community. The CFEEC makes no recommendation as to the specific level of care a beneficiary may require beyond the threshold requirement of more than 120 days of in-home care.

After being found eligible for MLTC, beneficiaries must then apply to a specific MLTC plan, which must conduct another assessment of the beneficiary in order to determine the level of

---

[2]      Available at https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_partial_capitation_model.pdf

in-home care the plan will authorize. Enrollment in an MLTC plan occurs after the plan has conducted its assessment and agreed to authorize services; the MLTC plan does not provide any services until enrollment becomes effective.

## II.  The Medicaid Beneficiaries Seeking Injunctive Relief

### A.   Ms. Logan

Sixty-eight year-old Ms. Logan, an Erie County resident, has cerebral palsy and had lived by herself in an apartment for many years until March 2014, when she sprained her ankle. After being hospitalized briefly, she was discharged to a nursing facility for short-term rehabilitation but has remained there for two years. Currently, she cannot walk independently, which she attributes to inadequate rehabilitative services. Ms. Logan asserts that she is medically appropriate for home care services, but the MLTC plans to which she has applied have either declined to offer her a benefits package with 24-hour care or have found her ineligible for enrollment. Defendant pays for Ms. Logan's 24-hour care at the nursing home facility through fee-for-service ("FFS") Medicaid, pending her enrollment in an MLTC plan.

Plaintiffs assert that Ms. Logan has been denied physical therapy at the nursing home, which has caused her muscles to atrophy and her condition to deteriorate. She is no longer able to walk on her own and is not permitted to take care of basic needs on her own; she must use a Hoyer lift to transfer from her bed to her

-6-

wheelchair. Ms. Logan's treating physician has opined that she can be served appropriately in the community, but in order to do so she will need 24-hour care at home. Because she is covered by both Medicaid and Medicare and now needs more than 120 days of in-home care, she is required to enroll in an MLTC plan to obtain in-home care. Ms. Logan has been assessed multiple times by Defendant's conflict-free assessor, Maximus, and each time been found eligible for in-home care services and enrollment in an MLTC plan. However, the MLTC plans with which she has sought to enroll have, for various reasons, refused to authorize 24-hour in home care. Ms. Logan is in danger of losing her apartment, which is paid for through a housing voucher that requires her to live in the apartment. Pending her enrollment in an MLTC plan, Defendant pays for Ms. Logan's 24-hour care at the nursing home through fee-for-service Medicaid.

**B.   Mr. Scofero**

Sixty-eight year-old Mr. Scofero, a homeowner in Wayne County, suffered a stroke in January 2015 that left him unable to move his left side. Since the stroke, he has been confined to a nursing home in Monroe County. Mr. Scofero indicates that he assessed multiple times by Defendant's conflict-free assessor, Maximus, and been found eligible for community-based services and MLTC enrollment. He asserts that every MLTC plan he has approached for services has either failed to authorize sufficient services, i.e., 24-hour, in-

home care, for him; or has refused to complete the assessment, because they will not authorize that amount of services for him. Mr. Scofero has also requested services from the Wayne County Department of Social Services ("Wayne County DSS"), which he alleges delayed for months before conducting an assessment. According to Mr. Scofero, after the assessment, Wayne County DSS refused to provide him with 24-hour home care. Pending his enrollment in an MLTC plan, Defendant pays for Mr. Scofero's 24-hour care at the nursing home through fee-for-service Medicaid.

## GENERAL LEGAL PRINCIPLES

### I.   Standards Relevant to Preliminary Injunctions

For over 50 years, it was well settled in the Second Circuit that a party seeking injunctive relief was required to satisfy a two-pronged test by showing "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2d Cir. 2012). In three decisions issued in 2008 and 2009, the Supreme Court articulated a four-factor test for determining whether a preliminary injunction should issue. See, e.g., Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("A plaintiff seeking a preliminary injunction must establish that [1] he is

likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest.").

District courts in this Circuit have observed that "[d]espite the seeming inconsistency of the standards for a preliminary injunction set forth by the Supreme Court and the Second Circuit, the Second Circuit has subsequently reaffirmed that its standard remains good law." Marblegate Asset Mgmt. v. Educ. Mgmt. Corp., 75 F. Supp.3d 592, 604 (S.D.N.Y. 2014) (citing Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 38 (2d Cir. 2010) (finding no indication in Winter that Supreme Court meant "to abrogate the more flexible standard for a preliminary injunction" utilized in the Second Circuit, "seven of its sister circuits, and in the Supreme Court itself")). In recent cases, the Second Circuit has taken different approaches. It has combined the Winter factors with its own two-factor test, see Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (incorporating additional factors), and it has given the plaintiffs the option of meeting either test, see Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015) (noting that "[a] party seeking a preliminary injunction must either show[,]" that he meets the two-part test set forth in the Second Circuit's own precedent, e.g., Christian Louboutin S.A., 696

-9-

F.3d at 215, or the four-part test articulated by the Supreme Court in, e.g., Winter, 555 U.S. at 20). Thus, "[t]o say that there is confusion in this Circuit regarding the appropriate standard for assessing an application for a preliminary injunction would be an understatement." Golden Krust Patties, Inc. v. Bullock, 957 F. Supp.2d 186, 194 (E.D.N.Y. 2013) (quoting Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010)); accord, e.g, Gen'l Mills, Inc. v. Chobani, LLC, No. 3:16-CV-58, 2016 WL 356039, at *5 (N.D.N.Y. Jan. 29, 2016).

## II. Prohibitory Versus Mandatory Injunctions

An additional level of complexity arises due to the fact that the two different types of preliminary injunctions—prohibitory and mandatory—require different analyses. While "[a] preliminary injunction is usually prohibitory and seeks generally only to maintain the status quo pending a trial on the merits[,]" Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (citation omitted), "[a] mandatory injunction . . . is said to alter the status quo by commanding some positive act." Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted). "This distinction matters, since a party seeking a 'mandatory' preliminary injunction must demonstrate a 'clear' or 'substantial' likelihood of success on the merits in addition to the other strictures imposed by the standard . . . [for prohibitory preliminary injunctions]." General Mills, Inc. v.

Chobani, LLC, 2016 WL 356039, at *7 (quoting Tom Doherty Assocs., Inc., 60 F.3d at 34); see also Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) ("The burden is even higher on a party . . . that seeks 'a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo.'") (quotation omitted). A mandatory preliminary injunction "'should issue only upon a *clear showing* that the moving party is *entitled to the relief requested*, or where *extreme or very serious damage* will result from a denial of preliminary relief.'" Id. (quotation and internal quotation marks omitted; emphases supplied); see also, e.g., Stanley v. Univ. of So. California, 13 F.3d 1313, 1320 (9th Cir. 1994) ("When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'") (quotation and internal quotation marks omitted); Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 441 F.2d 560, 561-62 (5th Cir. 1971) ("[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'") (quotation omitted).

## DISCUSSION

### I.  Preliminary Matters

While Plaintiffs partially phrase their demand for relief in

prohibitory terms, they are actually seeking a mandatory preliminary injunction, because they are asking that this Court "order[ ] an affirmative act or mandate[ ] a specified course of conduct[,]" Tom Doherty Assocs., Inc., 60 F.3d at 34, be performed by Defendant. Specifically, Plaintiffs want this Court to compel Defendant to "immediately arrange for" Plaintiffs to begin receiving 24-hour in-home care services, though it is unclear by whom, exactly, these services are to be provided. Since the gravamen of Plaintiffs' complaint is that, to date, they have been unable to obtain 24 hour in-home care, the requested injunction clearly will "alter the status quo[,]" Tom Doherty Assocs., Inc., 60 F.3d at 34. Plaintiffs have ignored the distinction between prohibitory and mandatory injunctions, and consequently have not attempted to fulfill the heightened "clear showing" standard. See id.

Likewise, Plaintiffs have not addressed the Winter four-factor test vis-à-vis the Second Circuit's traditional two-factor test. See Pl's Mem. (Dkt #19-4), p. 16 (stating that they must demonstrate irreparable harm, a "likelihood of success" on the merits, and a balance of hardships tipping in their favor). As discussed further below, the Court finds that Plaintiffs have not fulfilled the less demanding standard for obtaining a prohibitory injunction, i.e., a substantial likelihood of success of the merits, with regard to their claims. It necessarily follows that

they have not made the "clear showing" of entitlement to relief that is required to obtain the mandatory injunction they seek. Because Plaintiffs are unable to make the required showing on the merits element, the Court need not address the remaining elements.

## II. First Claim for Relief: Violation Medicaid's "Reasonable Promptness" Provision

Plaintiffs assert that Defendant's "failure to ensure provision of medically necessary in-home care" to Plaintiffs and putative class members "violates the reasonable promptness provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(8), enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983." Supplemental Complaint ¶ 246.

Title 42 U.S.C., Section 1983 creates a cause of action for the infringement of rights guaranteed by federal law, e.g., Maine v. Thiboutot, 448 U.S. 1, 4 (1980), including, in certain cases, violations of the Medicaid Act. E.g., Equal Access for El Paso, Inc. v. Hawkins, 562 F.3d 724, 729 n.3 (5th Cir. 2009) (considering Section 1983 claim alleging violation of Medicaid's reasonable promptness provision) (citing Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 524 (1990); other citation omitted).

Section 1396a(a)(8) of Title 42 U.S.C. provides that "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all

-13-

eligible individuals." 42 U.S.C. § 1396a(a)(8). The Medicaid Act expressly states that "medical assistance" means "payment of part or all of the cost of . . . care and services . . . for individuals" who meet certain eligibility requirements. 42 U.S.C. § 1396d(a). "Consistent with this definition, the [Medicaid] Act expressly refers to 'medical assistance' in financial terms." Equal Access for El Paso, Inc., 562 F.3d at 727 (citing 42 U.S.C. § 1396d(b) (referring to "amounts expended as medical assistance for services")). As a general rule, a statutory "definition which declares what a term 'means' . . . excludes any meaning that is not stated." Colautti v. Franklin, 439 U.S. 379, 392 n. 10 (1979)). The Second Circuit does not appear to have considered the issue, but those circuit courts which have done so have determined that it is "clear from the text of the Act itself" that "'medical assistance' under Medicaid means 'payment' for various medical services[,]" and not "actual medical services." Equal Access for El Paso, Inc., 562 F.3d at 727 (citing, inter alia, Oklahoma Ch. of the Am. Acad. of Pediatrics (OKAAP) v. Fogarty, 472 F.3d 1208, 1214 (10th Cir.2007) (rejecting the plaintiffs' argument that the Reasonable Promptness Provision "makes a state Medicaid program directly responsible for ensuring that the medical services enumerated in the Medicaid Act . . . are actually provided to Medicaid beneficiaries in a reasonably prompt manner" and noting "agree[ment] with" the Seventh Circuit's decision in Bruggeman ex rel. Bruggeman v. Blagojevich,

324 F.3d 906, 910 (7th Cir. 2003), that "the term 'medical assistance' as employed in [the Reasonable Promptness Provision] refers to financial assistance rather than to actual medical services" (internal quotation marks omitted)); other citations omitted). In light of this precedent, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success of the merits with regard to their claim based on Medicaid's reasonable promptness provision, much less the "clear showing" of entitlement to relief that is required to obtain a mandatory injunction.

## II.        Second Claim for Relief: Due Process Violation Based on Inadequate Notice

For their second claim for relief, Plaintiffs assert that Defendant has failed to ensure that individual Medicaid beneficiaries receive adequate written notices of MLTC plan determinations refusing to authorize the level of care they require and informing them of their right to challenge the MLTC plan's determination by requesting a fair hearing.

As the Second Circuit has observed, "Medicaid applicants and recipients are entitled to fair hearing rights when a decision is made by a state agency that adversely affects their right to receive benefits." Catanzano by Catanzano v. Dowling, 60 F.3d 113, 117 (2d Cir. 1995). In particular, the Medicaid statute, "requires that the state plan must 'provide for granting an opportunity for a fair hearing before the State agency to any individual whose

-15-

claim for medical assistance under the plan is denied or not acted upon with reasonable promptness.'" Id. (quoting  42 U.S.C. § 1396a(a)(3)). The Medicaid regulations also "require that, whenever the state agency takes action to terminate, suspend, or reduce Medicaid eligibility or covered services, an applicant or recipient receive a fair hearing that meets the due process standards enunciated in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)." Id. (citing 42 C.F.R. §§ 431.200 (setting forth basis and scope of fair hearings), 431.205(d) ("The [state's] hearing system must meet the due process standards set forth in Goldberg . . . , and any additional standards specified in this subpart."); see also 42 C.F.R. § 431.206 (specifying contents of notice and to whom and when such notice is required).

"It is fundamental, however, that 'the action inhibited by the [due process clause] of the Fourteenth Amendment is only such action as may fairly be said to be that of the States.'" Catanzano by Catanzano, 60 F.3d at 117 (quoting Shelley v. Kraemer, 334 U.S. 1, 13 (1948)). Therefore, it is "only when the adverse actions are implemented through state action[,]" that the due process fair hearing rights required by the Medicaid statute and regulations are triggered. Id.

Plaintiffs here allege that they are entitled to notice and fair hearing rights with regard to the MLTC plans' decisions regarding the number of hours of per-day or per-week home care

-16-

services that an MLTC plan has assessed the individual as requiring and has offered to provide as part of a benefit package, should that individual choose to enroll in the particular plan. However, Plaintiffs have not attempted to demonstrate that these decisions by the MLTC plans "should be deemed 'state actions' that trigger [their] fair hearing rights." Catanzano by Catanzano, 60 F.3d at 117; see also id. at 117-18 (discussing state action requirement and applicable standard). Plaintiffs thus have not shown a substantial likelihood of success on the merits of their due process claim.

### III. Third, Fourth and Fifth Claims for Relief: The ADA and the Rehabilitation Act

In their third and fourth claims for relief, Plaintiffs argue that Defendant's actions and omissions violate the anti-discrimination provisions of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). In the fifth claim for relief, Plaintiffs assert that Defendant has violated the ADA and Section 504 and their respective implementing regulations, 28 C.F.R. §§ 35.130(b)(3) and 41.51(b)(3)(i); and 45 C.F.R. § 84.4(b)(4) by utilizing methods of administration that discriminate against individuals with disabilities. "Because the applicable provisions of the ADA and the Rehabilitation Act are 'co-extensive,'" M.R. v. Dreyfus, 697 F.3d 706, 733 (9th Cir. 2012) (citation omitted), the Court discusses both claims together, with

a focus on the ADA. See Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) (considering plaintiffs' Title II and Section 504 claims "together because these provisions impose the same integration requirements") (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)).

"[T]he ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled." Helen L. v. DiDario, 46 F.3d 325, 333 (3d Cir. 1995). Plaintiffs here allege a violation of the "integration regulation" or "integration mandate," which provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d); see also U.S. Dep't of Justice, Statement of Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (2011),[3] at 3 ("[A] public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and or/programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities; and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies

---

[3]     Available at https://www.ada.gov/olmstead/q&a_olmstead.htm (last accessed July 21, 2016).

upon the segregation of individuals with disabilities in private facilities or program. . . .") (quoted in Day v. D.C., 894 F. Supp.2d 1, 23 (D. D.C. 2012)).

In Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), "the Supreme Court interpreted the integration mandate to mean that the 'unjustified isolation' of disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA." Davis v. Shah, 821 F.3d 231, 262 (2d Cir. 2016) (quoting Olmstead, 527 U.S. at 597). In Olmstead, the sole dispute between the parties, and the only question decided by the Supreme Court, was "where Georgia should provide treatment, not whether it must provide it." Rodriguez, 197 F.3d at 619 (citing Olmstead, 527 U.S. at 593-94 (detailing Georgia's provision of treatment to mentally disabled patients in institutions); emphasis in original). The Supreme Court explained it did "not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" 527 U.S. at 603 n. 14 (internal citation omitted). Rather, Olmstead held that "States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." Id. In Olmstead, Georgia already had numerous state programs that provided community-based treatment the plaintiffs were qualified to receive. See Olmstead,

527 U.S. at 593-94, 602-03. Nevertheless, Georgia contended, it was justified in keeping certain mentally disabled individuals institutionalized, due to the costs involved in caring for them in the community. The Supreme Court rejected that argument and held that the ADA's integration mandate "require[s] placement of persons with mental disabilities in community settings rather than in institutions . . . [1] when the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account [a] the resources available to the State and [b] the needs of others with mental disabilities." Olmstead, 527 U.S. at 587; see also id. at 607.[4]

Plaintiffs assert that they have demonstrated a substantial likelihood of success on their integration mandate claim because they are qualified individuals with disabilities currently confined to institutional settings, and they meet the three Olmstead elements. First, Plaintiffs assert that their doctors and "Defendant's own conflict-free assessor, Maximus, have determined that in-home services are appropriate for them." Pl's Mem. (Dkt #19-4) at 23. Second, "neither [Mr. Scofero nor Ms. Logan] opposes

---

[4]
    While Olmstead dealt specifically with individuals having mental disabilities, courts apply the three-part Olmstead test applies regardless of the type of disability. See, e.g., Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 610-11 (7th Cir. 2004) (applying Olmstead to case involving "medically fragile" individual who needed round-the-clock one-on-one nursing care in order to survive).

community placement." Id. Third, Plaintiffs argue, "requiring Defendant to ensure that Plaintiffs receive the very services he contracts with MLTC plans to provide, and that the county-based system is supposed to provide on an interim basis, cannot be construed as an unreasonable request." Id. The second Olmstead factor is undisputed. Therefore, the Court turns to a consideration of the first and third Olmstead elements.

Plaintiffs have devoted most of their efforts to establishing the first Olmstead element—the appropriateness of community-based care for each of them. Plaintiffs state, e.g., that the nurse assessor from Maximus informed Mr. Scofero that he was a good candidate for 24-hour care, and did a home visit indicating that he could live safely in his house, if certain modifications were made. See Declaration of Gene Angelidis ("Angelidis Decl.") (Dkt #19-5) ¶ 12 ("The nurse [from Maximus] asked [Mr. Scofero] a lot of questions and then told us that she thought Joe would be able to get 24 hour care. Then . . . I went with her to [Mr. Scofero]'s house. She indicated that with a few modifications [Mr. Scofero] would be able to go home. . . ."); id. ¶ 13 ("Soon after [Mr. Scofero] got a letter from Maximus saying that he did qualify for the home care program and that he just needed to sign up with a managed long term care plan."). Defendant discounts the value of these statements on the basis that they are vague and amount to inadmissible hearsay. Plaintiffs also point to affidavits from

their physicians recommending that they receive in-home care services. For instance, Thomas White, M.D., states that Ms. Logan "can and should be cared for appropriately at home in her own apartment, though her needs for personal care services may be greater than before[,]" and that she is "likely to require round-the-clock homecare services in order to return to her apartment safely." Dkt #19-8 ¶¶ 10, 11.

According to Defendant, "no entity has determined that either Mr. Scofero or Ms. Logan is appropriate for '24-hour in-home care.'" Def's Mem. at 11 (citing Willard Decl. ¶¶ 8, 83). Defendant asserts that Maximus, which performs the functions of the Conflict Free Evaluation and Enrollment Center ("CFEEC"), evaluates only whether a potential MLTC enrollee needs more than 120 days of community-based long term care services; it does not evaluate or assess whether the potential enrollee meets another requirement, namely, that he or she be capable, at the time of enrollment, of returning to his or her own home and community without jeopardy to his or her health and safety. See Def's Mem. (Dkt #21) at 12.

Defendant argues that although a physician must issue an order describing the Medicaid recipient's medical condition and need for assistance with personal care tasks, the physician must not recommend the number of hours of services the recipient should receive. See Def's Mem. (Dkt #21) at 16 (citing 18 N.Y.C.R.R. § 505.14(b)(3)(i)(a)(3) (stating that physicians recommending

personal care services "must not recommend the number of hours that the patient should be authorized to receive"); Kuppersmith v. Dowling, 93 N.Y.2d 90, 93, 99-100 (1999) (finding regulation prohibiting physicians from recommending the number of hours of home care not arbitrary and capricious; declining to create judicial presumption in favor of treating physician's estimate regarding number of hours of home care services required)). However, Defendant's own representative, Willard, states in her declaration that these "regulations are obsolete and will be repealed and replaced as of July 6, 2016[,]" Willard Decl. ¶ 74, by new regulations that "would require the provision of services to Medicaid recipients who are in 'immediate need' of personal care services or consumer directed personal assistance, including those who are excluded from MLTC or pending enrollment in MLTC."Id. ¶ 72. Thus, Defendant's argument regarding Plaintiffs' physicians' statements is based, at least in part, on regulations that apparently are no longer valid. The Court accordingly will disregard that aspect of Defendant's argument based on Kuppersmith.

Nevertheless, even accepting at face value their physicians' statements that Plaintiffs are "appropriate" for in-home care, and that they have demonstrated a substantial likelihood of success on the "appropriateness" element of Olmstead, the Court cannot find that injunctive relief can be granted. As noted above, though the second Olmstead element is undisputed,

Plaintiffs have not attempted to make an affirmative showing regarding the third Olmstead element, i.e., whether the provision of community-based services can be reasonably accommodated, taking into account the resources available to the State and the needs of other disabled individuals. Plaintiffs simply assert it "cannot be construed as an unreasonable request" to demand that Defendant "ensure that Plaintiffs receive the very services he contracts with MLTC plans to provide, and that the county-based system is supposed to provide on an interim basis[.]" Pl's Mem. (Dkt #19-4) at 23. This is insufficient to carry Plaintiffs' high burden of persuasion. See Peter B. v. Sanford, No. CIV.A. 6:10-767-JMC, 2010 WL 5912259, at *6 (D. S.C. Nov. 24, 2010) (the plaintiffs have put forward evidence that in all material respects it is less costly to provide the community-based, in-home services than institutional ones.") (citations to record omitted), rep. and rec. adopted, No. 6:10-CV-00767-JMC, 2011 WL 824584 (D. S.C. Mar. 7, 2011). Moreover, in Defendant's opposition, he has set forth factual allegations suggesting that the provision of community-based services to Plaintiffs may not be able to be reasonably accommodated, taking into account the resources available to the State and the needs of other disabled individuals. See Willard Decl. ¶¶ 86-87.[5]

---

[5]
   Willard avers that after this litigation commenced, her staff contacted Wayne County DSS, which subsequently determined that Mr. Scofero would be appropriate for personal care services. However, after being unable to secure coverage from a home care services agency due to a shortage of aides, Wayne County DSS chose to authorize coverage under the Consumer Directed Personal Assistance Program as an alternative and offered approximately 38 hours per week

Finally, the Court observes that there is no indication that the DOH itself provides long term home care services; rather, it is the MLTC plans and, in limited, interim circumstances, the local Social Services districts. None of the MLTC plans or the local Social Services districts are parties to this action but each of them is arguably necessary for complete relief to be afforded to these Plaintiffs. The absence from this litigation of the MLTC plans and local Social Services districts provide an independent and alternative reason to deny injunctive relief. See Inc. Vill. of Atl. Beach v. Pebble Cove Homeowners' Ass'n, 527 N.Y.S.2d 429, 430 (2d Dep't 1988) (village sued homeowners' association and moved for injunctive relief; court found that denial of  motion for preliminary injunction was "required" based on village's failure to join the individual unit owners of the homeowners' association, who were "necessary parties in light of the nature of the relief sought"). In particular, with regard to the MLTC plans, Plaintiffs have not established that they and the State "are . . . united in interest and . . . stand or fall together. . . ." Mt. Pleasant Cottage Sch. Union Free Sch. Dist. v. Sobol, 558 N.Y.S.2d 713, 714 (2d Dep't 1990), aff'd, 78 N.Y.2d 935 (1991) (finding that court did not abuse discretion in dismissing case for non-joinder of school principal; while respondent, as chief of executive officer

---

of this type of assistance. However, Mr. Scofero declined this type of assistance, and Wayne County DSS issued him a notice of denial dated May 3, 2016, with fair hearing rights to review the denial.  See Willard Decl. ¶¶ 86-87.

of state education system had authority over petitioner, the school district, he did not have corresponding authority over school principal, a private citizen) (citation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction (Dkt #19) is denied in its entirety without prejudice.

**SO ORDERED**

**S/ Michael A. Telesca**

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     July 25, 2016
           Rochester, New York